Filed 7/26/24  V.K. v. Superior Court CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| V.K.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | A170399<br><br>(San Francisco County<br>Super. Ct. No. JD223302) |

        This dependency case arises from allegations of inappropriate physical discipline by V.K. (Mother) on her 14-year-old son, L.K. (Minor).  The juvenile court declared Minor a ward of the court and ordered that Mother receive family reunification services, including therapeutic visitation with Minor.  However, not a single visit occurred because Minor refused all contact with Mother.  At the 12-month review hearing, the court found that the San Francisco Human Services Agency (the Agency) provided Mother with reasonable services, ordered termination of reunification services, and set a

1

permanency planning hearing under Welfare and Institutions Code section 366.26.[1]

Mother seeks extraordinary relief from the juvenile court's decision and a stay of the proceedings below. She contends the court erred in finding that reasonable services had been provided to her because the record shows that Minor was given total discretion to decide whether visitation would occur. We agree and grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Minor came to the Agency's attention from reports of physical abuse and a history of inappropriate physical discipline by Mother. On November 30, 2022, Minor went to Huckleberry House Shelter for Youth (Huckleberry House) and reported that on November 29 (the previous day), Mother hit and slapped him on the arms and head during an argument, and that after he went into his bedroom and locked the door, Mother broke into the room and continued the abuse.

On December 12, 2022, the Agency filed a juvenile dependency petition alleging that Minor, who was 14 years old at the time, had suffered or was at substantial risk of suffering serious physical harm inflicted nonaccidentally by Mother (§ 300, subd. (a)); failure to protect due to Mother's history of using inappropriate physical discipline methods, inability to properly care for and supervise Minor due to irreconcilable differences, and anger management issues (*id.*, subd. (b)(1)(a)); and serious emotional damage due to Mother's history of verbal and emotional abuse (*id.*, subd. (c).) In addition to describing the November 29 incident, the petition alleged that Mother had an extensive history of physically disciplining Minor by hitting and slapping him; a history of threatening to harm him and verbally and emotionally

---

[1] Further unspecified statutory references are to this code.

abusing him; and an extensive child protective services history with multiple referrals regarding her inability to care for Minor.

**A. Detention**

In its detention report, the Agency reported six previous referrals involving Mother and Minor dating back to 2017, five of which did not meet the criteria for an investigation "but indicated concerns regarding general neglect, physical abuse, and emotional abuse." Referrals in November 2022 involved Minor "running away from home due to having been kicked out by his mother as well as [Minor] disclosing that his mother has hit him with a belt on several occasions." Minor estimated that Mother had hit him over 50 times in the past year, usually with an open hand, but sometimes with a belt, and once using the metal part of the belt. Minor reported feeling unsafe to return home, and that "he has had thoughts about hurting himself."

Family friend M.G. had known Mother and Minor since 2016, when they lived with him for a few months. M.G. reported Mother's lack of affection and persistent criticism of Minor; her anger and severe mood swings; and signs of physical abuse of Minor as a child, including a cut on his face and bruises on his arm that he refused to talk about.

The Agency recommended therapeutic visitation between Minor and Mother but stated that "at this time, minor . . . has expressed that he would not like to have visitations or contact with his mother."

On December 22, 2022, the juvenile court ordered Minor to be detained and placed with M.G. The court gave the Agency "discretion to arrange supervised visitation" between Mother and Minor.[2] The court also issued a

---

[2] The juvenile court did not check the specific box on the minute order form for "Mother to receive visitation [ ] monitored [ ] supervised [ ] unsupervised [ ] therapeutic visits." Nor did the court check the box for Mother "not to receive visitation until further order of the court" based on a

temporary restraining order against Mother prohibiting her from contacting Minor, but allowing for visitation "as arranged and supervised by" the Agency. (Capitalization omitted.)

**B. Jurisdiction and Disposition Report**

In its January 2023 jurisdiction and disposition report, the Agency recommended that the allegations of the petition be sustained and that Minor be declared a ward of the court. The Agency reported that Mother and Minor immigrated from Russia approximately 8 years prior and had lived in New York before moving to San Francisco. Minor reportedly had a good relationship with his maternal grandmother in Russia but no relationship with his father.[3] Mother was employed, but the family struggled financially and experienced food shortages, and Minor came to school hungry on several occasions.

Mother denied the allegations of physical, verbal, or emotional abuse, as well as the claims that she hit, physical disciplined, and threatened Minor. Mother accused Minor of lying and stealing and failing to abide by house rules. The Agency assessed Mother as a competent and loving parent who struggled financially to meet Minor's basic needs and suffered from anxiety and controlling tendencies. Mother was reportedly raised with corporal

finding that visitation would be detrimental. Instead, the court checked a box that, by its terms, pertains to the Agency's "discretion to move" visitation to "unsupervised" or "overnight" after notice to Minor's counsel, but the court crossed out the words "move," "unsupervised," and "overnight," and wrote "arrange supervised visitation pursuant to SF local rules." In other words, the court's visitation ruling at the time of detention was as follows: "The Agency has the discretion to arrange supervised visitation pursuant to SF local rules."

[3] During the dependency proceedings, the Agency located Minor's alleged father but reported that he did not wish to elevate his status or have a relationship with Minor.

punishment and was unaware that this was not accepted in the United States. The Agency remarked that Mother "appears to lack insight on how her behavior has led to the breakdown of her relationship with her son" and was "fixated on blaming [M.G.] for turning [Minor] against her rather than exploring how her actions have impacted their relationship."

Minor reported he did not feel safe with Mother and did not wish to return to her custody. Though he previously had suicidal thoughts linked to his relationship with Mother, he reported having no such thoughts currently. Minor refused to attend therapy sessions including family therapy, stating he does not wish to talk to " 'strangers about personal things.' " Minor wanted M.G. to become his legal guardian or adoptive parent, and the Agency noted M.G. was willing to become Minor's legal guardian should he be unable to reunite with Mother. The Agency reported that Minor's placement with M.G. provided stable housing, regular meals, access to activities in the community, and safety.

Regarding visitation, the Agency indicated that "[t]here is no current visitation plan as there is a restraining order in place preventing [Mother] to have contact with [Minor]. [Minor] does not wish to have visitation with his mother due to her being 'over controlling' as well as hitting him, screaming at him and accusing him of lying and stealing. Though [Minor] does desire to have a better relationship with his mother, he does not feel that it can happen while [Mother] continues to blame him for her actions towards him." The Agency further stated that "[v]isitation is not recommended at this time, as [Minor] reports continuing to feel unsafe with his mother. Visitation with [Mother] should be reconsidered when she has better insight into her behavior and doesn't blame [Minor] for her actions."

The Agency outlined a reunification case plan for Mother and offered various services including parenting education, and individual and family therapy "when the minor is willing to participate."

**C. Addendum Reports**

In a February 2023 addendum report, the Agency reported that Mother was engaging with a therapist at Richmond Area Multi-Services (RAMS) but remained fixated on her desire to have Minor moved to a new placement due to the souring of her relationship with M.G. Mother reportedly had "very little awareness" of the effect her controlling behavior and emotional and physical abuse has had on Minor and "continue[d] to blame the minor for what she sees as his faults instead of using the time to come to terms with how her conflicts with [M.G.] as well as the minor has a bearing on whether or not the minor feels safe to return home given the increased level of ill-treatment in the home."

Minor was reportedly doing well in his placement, improving in school, and becoming more vocal and confident with his social worker. However, he remained "adamant that he does not want to have contact with [Mother] at any time." Minor also refused therapy and counseling because he did not "wish to speak with strangers about his personal life and does not feel that it would be beneficial to have family therapy as he is concerned that [Mother] will use it as a platform to blame him and accuse him of things he has not done."

The Agency opined that "[b]ecause of [Mother's] current inability to address her own behaviors it is not in the best interest of the minor to have contact with her nor to be reunified. Additionally, the minor's refusal to have visitation or return home indicates the severity of the breakdown of the relationship between the two."

6

In March 2023, the Agency filed another addendum report indicating that Mother was continuing her therapy at RAMS and gaining insight into her behaviors and actions. She had also begun attending parenting courses for parents of teenagers, an anger management group, and other relevant courses within the Russian community. According to the Agency, "[t]hough the recommendation continues to be that [Minor] not be reunified with [Mother] at this time, it should be noted that [Mother] has worked and continues to work on herself and [is] moving towards opening lines of communication with [Minor]."

Minor, however, remained "adamant that he does not wish to return to [Mother's] custody. He stated that due to his ongoing concerns that she will revert to her earlier behaviors, he does not feel safe and that the home environment is not stable." He also continued to refuse to engage in individual therapy and therapeutic visitation with Mother, "as he does not feel that it would be helpful and does not want to have contact with [Mother]." The Agency recommended that "when [Minor] is willing to engage in therapeutic services that he have access. It is the hope of the Agency that over time [Minor] will become open to receiving therapy in order to come to terms with the historical issues within the relationship with [Mother], to allow the family to begin healing."

## D. First Amended Petition; Jurisdiction and Disposition Hearing

On April 12, 2023, the Agency filed a first amended petition striking the serious physical harm allegation under section 300, subdivision (a) (paragraph A-1), several of the failure-to-protect allegations under section 300, subdivision (b) (paragraphs B-2, B-4), and the serious emotional damage allegation under section 300, subdivision (c) (paragraph C-1). What remained were the allegations of Mother's failure to protect under section 300,

7

subdivision (b), with supporting allegations that Mother used inappropriate physical discipline (both on November 29, 2022, and during her extensive history of physical discipline) (paragraph B-1); and that Mother had anger management issues requiring assessment and treatment for her history of verbal and emotional abuse of Minor (paragraph B-3).

At the April 13, 2023, jurisdiction and disposition hearing, Mother submitted to the allegations of the first amended petition and waived her right to a trial. The juvenile court found true the allegations of first amended petition that Minor was a person described by section 300, subdivision (b), and that clear and convincing evidence support the need for his removal from Mother. The court placed Minor with M.G. The court ordered family reunification services for Mother and checked the box for Mother "to receive visitation . . . "[a]s previously ordered." The court also dissolved the temporary restraining order against Mother.

**E. Six-Month Review**

In September 2023, the Agency filed a status review report in advance of the six-month review hearing, recommending an additional six months of family reunification services. The Agency commended Mother for her communication, follow-through on referrals, engagement in services, and completion of several parenting courses and workshops and reported that Mother was "very engaged in weekly therapy, and has been making progress in her therapeutic goals."

However, because Minor "continue[d] to refuse visits with his mom, [Mother] has not had the opportunity to demonstrate her parenting skills in visits." The Agency noted that Mother "has made efforts to stay connected with [Minor] while respecting his boundaries," including "consistently sending letters" to Minor through protective services worker (PSW) Margaret

8

Halliday, but Minor "refused to receive these letters, so [Mother] paused this effort." Mother also "provided two birthday cards . . . both with loving and appropriate messages."

The Agency further reported that Mother "has struggled to manage her stress" regarding Minor's mental health. The Agency described one incident "in the spring semester [when Mother] contacted and showed up to the school to have [Minor] pulled from class. This led [Minor] to feel his mother was intentionally harassing and controlling him. The school reported that these incidents were visibly negatively impactful for [Minor]." Mother also was "capturing and circulating [Minor's] social media videos, and characterizing them as gravely concerning and possible signals of sexual abuse," even though Halliday and Minor's school guidance counselor concluded the videos were age-typical joke videos. Minor felt that Mother's "monitoring and sharing of his benign online presence was an intentional effort by his mom to humiliate him." Halliday felt that Mother was not intentionally trying to humiliate Minor, but that her assessment of Minor's behavior "appears at times to be paranoid and not reality-based."

Minor reportedly had "anxiety surrounding his mother and the prospect of running into her in the community," as well as "a great deal of anger towards his mother, and he is worried about his ability to control his anger if he sees his mother." Minor was assigned a therapist and was "agreeable with attending at least one session." The Agency recommended that Minor and Mother attend family therapy "when the minor is willing to participate."

The Agency further reported that Minor felt well-supported by M.G., and that despite Mother's claims that M.G. was alienating Minor from Mother, Halliday "repeatedly" observed M.G. encourage Minor to have

9

contact with Mother. M.G. was also supportive of therapy for Minor and was "open to improving the relationship between himself and [Mother], in hopes that this will support [Mother] having an increased role in [Minor's] day-to-day life."

At the six-month review hearing on December 15, 2023, the juvenile court found that conditions still existed justifying the court's dependency jurisdiction. The court also found by clear and convincing evidence that reasonable efforts had been provided or offered to Mother to overcome the problems that led to the dependency. The court ordered an additional six-month period of reunification services. The court further specified that Mother was "to receive visitation . . . as previously ordered."

## F. Status Review and Addendum Report Prior to 12-Month Review

In its January and April 2024 reports prior to the 12-month review hearing, the Agency changed its recommendations and asked the juvenile court to terminate reunification services.

The Agency reported that Mother was continuing to engage in individual therapy and services, including parenting courses. Mother expressed remorse for how she parented Minor and the harm she had caused, and she made progress in her therapeutic goals, including managing stress, and understanding the relationship between her upbringing and her experience with parenting her son. However, she continued to struggle with emotional regulation and was often combative during the Agency's regular meetings.

Mother also continued to raise concerns about M.G. attempting to alienate Minor from Mother, even though M.G. was observed regularly and strongly encouraging Minor to engage in therapy and to have contact with Mother. Mother requested co-parenting counseling with M.G., and the

Agency explored this option with Mother and her individual therapists, both of whom stated that recommending co-parenting counseling was beyond the scope of their expertise. The Agency did not believe co-parent counseling would be productive, as it continued to have concerns that Mother was focused on blaming M.G. for her separation from Minor.

During the reporting period, Mother sent a "concerning" text message to maternal grandmother, who mistakenly forwarded it to Minor. The message stated, "We have been through a lot and most of it is your fault," with a photograph of Mother smiling. Maternal grandmother was regretful for forwarding the message, "as she did not fully understand what she was sending," and Mother stated it was intended to be a private joke between her and maternal grandmother. The Agency opined that Mother's actions seemed "to make light of what [Minor] reports having experienced." Mother sent an apology letter to Minor, but he interpreted the message to mean Mother was happy Minor was no longer in her life. Minor also believed Mother sent the letter because she was told to do so, as the letter began by stating that PSW Halliday had recommended it. Upon receiving Mother's letter, Minor "appeared upset, as he looked down and balled the letter up. [Minor] seems to feel firmly that his mother has not made any progress."

Minor continued to refuse all contact and family therapy with Mother, and no visits occurred. Although Minor received routine updates from Halliday about the classes and services Mother participated in, "based on [Minor's] previous engagement with [Mother] in family therapy, [Minor] believes [Mother] is able to say the right things to have him returned, without having any behavioral change. [Minor] believes that if he is returned to his mother's care, he will again be 'beaten until he cannot move,' and receive excessive and inappropriate discipline, including being deprived [of]

11

food as punishment, and locked out of the home overnight." The Agency reported Minor's account "that when he engaged in family therapy with his mother at Huckleberry House, prior to the current dependency, he disclosed that he was experiencing physical abuse to the therapist. [Minor] reports that [Mother] was remorseful in therapy, however, when he returned home following therapy, he was beaten for what he disclosed. [Minor] feels betrayed by this experience. PSW Halliday assessed this past experience is a barrier to [Minor] feeling like any future therapy will be safe or beneficial to him. Additionally, this experience leads [Minor] to distrust any reported progress [Mother] has made, leading him to feel that future contact would be unsafe. [Minor's] perception that [Mother] is able to say the right thing publicly, but lack remorse and behavior change behind closed doors, appears to [Minor] to be reinforced by the text messages that were sent from [Mother] to [Minor] in error."

Minor engaged in individual therapy between November 2023 and January 2024, but he discontinued it because "he does not feel he needs therapy, and that it takes away from basketball." Halliday believed the previous therapist "may have also not been the right fit for" Minor and she resubmitted a referral for individual therapy.

The Agency recommended termination of services because "[d]espite [Mother's] efforts, [Minor] refuses contact with his mother and refuses to return home. [Minor] is doing well in placement, and expresses a desire to remain with the current caregiver." The Agency further recommended that Mother be provided with a minimum of two supervised visits per year, but that "visits should be at the youth's discretion."

## G. Trial Briefs Regarding Visitation

In advance of the contested 12-month review hearing, Mother filed a trial brief arguing the Agency failed to provide her with reasonable visitation services.  The Agency filed a response, supported by the declaration of Halliday.  Halliday averred that during her regular talks with Minor, she offered several options to him regarding visitation, "including a virtual visit where [Minor's] camera is off and mom is there but it is up to youth if he speaks to her; a virtual visit with the caregiver present as a support; a virtual visit where the caregiver speaks to mom and youth just listens in; and a virtual visit to include myself, grandma, [Minor's] therapist, and/or [Minor's] attorney."  Halliday spoke with Minor about "why it might be helpful to him to have visits with his mom."  She suggested that visiting with Mother may help Minor "let go of fear or anger" and provide "an opportunity to create a relationship with her with the boundaries that he wants in place."

## H. 12-Month Review Hearing

On May 6, 2024, the juvenile court held a contested 12-month review hearing.  We now summarize the relevant testimony.

### 1. *Halliday's Testimony*

Halliday testified there were no therapeutic visits between Minor and Mother during the proceedings, even though Halliday had encouraged Minor to have visits with Mother and believed he would benefit from them.

Halliday acknowledged that Mother had gained insight into her behaviors and parenting and had admitted that her parenting style was toxic and that she had hit Minor.  However, Mother continued to attribute much of the breakdown in her relationship with Minor to M.G. and Minor's own behavior.  Halliday further testified that Minor remained suspicious of Mother's progress due to prior experiences in family therapy.  He was also

13

impacted by the "sarcastic joke" text message that was mistakenly forwarded to him in November 2023.

Halliday spoke with M.G. and believed he "has shown his support for reunification between" Minor and Mother. Halliday did not observe M.G. exerting undue influence on Minor's perspective on therapy, Mother, or visitation, and instead "observed [M.G.] encourage [Minor] towards the agency's recommendations including visitation and therapy."

Regarding her efforts to encourage Minor to make contact with Mother, Halliday testified that Minor "has been concerned that he might feel overwhelming anger that he might not be able to control. I think there is also a lot of anxiety and fear around seeing the mother[.]" Halliday elaborated that Minor "was trying to convey that he might feel so upset or angry that he couldn't handle the interaction with his mother if he were to have an in-person visit with her," and that he suggested he might get violent. Halliday testified that M.G. did not influence Minor's decisions not to visit Mother and to terminate his individual therapy.

During Halliday's testimony, Minor was excused from the courtroom, leading to a short recess. When testimony resumed, Halliday testified the Agency had concerns about Mother's tendency to blame others, including Minor, as suggested in Mother's November 2023 text message. Though Mother had a history of presenting well in family therapy, the Agency was concerned she would punish Minor for what was shared in family therapy.

### 2. *Mother's Testimony*

Mother testified the family's previous attempt at therapy at Huckleberry House involved only "one session" and occurred "more than a year and a half ago." Mother denied getting angry at Minor for what he said during that therapy session.

14

Mother discussed what she had learned in therapy and parenting classes, including how punishment can be harmful, and how to better communicate. She regretted the text message and photograph and explained it "was a joke which I shared with my mom."

Mother took responsibility for the breakdown in her relationship with Minor and explained she "was in an unstable financial and family situation" and "would come down on my son" and "give him disproportionate consequences." She acknowledged her parenting style was not healthy, and she learned in therapy about positive discipline and how to effectively communicate with Minor.

Mother was worried about Minor's relationship with M.G. because she read reports where Minor was "repeating verbally what his foster parent is saying." Mother testified that she had "strong doubts" that M.G. was supporting reunification because his statements did "not coincide with the reality," and because he had already offered to adopt Minor.

### 3. *Decision*

The juvenile court remarked "this is not a typical situation" because "[i]t is unusual to hear from a minor that they are not even willing to visit and not even willing to do a Zoom visit, so I have to take that very seriously. Again, he is just a minor, and I appreciate Mom's position, which is it cannot just be the minor that controls the whole deal; however, it is the Court's obligation to consider the minor's interests and do the best I can for the minor at this stage given what has happened."

The juvenile court acknowledged the difficulty of evaluating Mother's progress when there were no visits, but the court felt it "cannot order that the child be forced into a car with anybody, a tech, take him to the door of a therapist, and then let him make the call. I cannot order the child to sit in a

15

Zoom room—and maybe his mom is not on the camera, maybe he is not on the camera—and see what happens. It is just not realistic. [¶] So I agree with [Minor's counsel] that if I too saw even an iota of help and hope, I would happily extend."

Acknowledging that Mother had gone "above and beyond what was required of her by the [A]gency," the juvenile court nevertheless found "a disconnect between what Mom is saying and putting in the letters and doing her classes and then what actually happens." The court cited the family therapy session in which Minor was later disciplined [by Mother] for sharing, which the court found to be "nothing but a betrayal to the child, so he lost trust to begin with." The court also cited the November 2023 text message, stating, "I don't know how that happens when we are in the middle of a very intense Human Services Agency case. None of that makes sense to me." The court found that Minor interpreted the text message "the only way I think any of us would interpret the message, which is yet another betrayal, that Mom is doing everything she is supposed to do to show folks that she is getting better, but underlying everything there is a deep sense that [Minor] is still to blame for what happened. [¶] So Mom can talk the talk, but she is not walking the walk is the issue, and I am very troubled by that text message."

The juvenile court further remarked that Minor was courageous to attend the hearing and noted he eventually "could not withstand it. He had to leave. I don't know if he wasn't feeling well for real or not, but when he left, it was the child version of a storm out, and I don't blame him. This is very tough stuff to have to go through over again and retraumatize yourself."

Finally, the juvenile court credited Halliday's testimony that M.G. was not unduly influencing Minor or trying to interfere with reunification.

16

The juvenile court ultimately adopted the recommendations of the Agency to terminate family reunification services. The court found by clear and convincing evidence that reasonable efforts had been provided or offered to Mother to aid her in overcoming the problems that led to the dependency. The court scheduled the section 366.26 permanency planning hearing for September 4, 2024.

Mother petitioned for review of the juvenile court's order and requested a stay of the section 366.26 hearing. (§ 366.26, subd. (l); Cal. Rules of Court, rule 8.452.) We issued an order to show cause, and the Agency responded.

## DISCUSSION

Family reunification services further the goal of the juvenile dependency system to preserve the family whenever possible. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) "When the state removes children from their parents, it is obliged to make reasonable efforts to reunify the family." (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49 (*Julie M.*).)

At the six- and 12-month review hearings, before a juvenile court may set a hearing under section 366.26 to decide whether to terminate parental rights and select a permanent plan for the child, the court must find by clear and convincing evidence that the parent was provided with reasonable reunification services designed to aid in overcoming the problems that led to the dependency. (See *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625–626; § 366.21, subd. (e)(8).) "[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

To support a reasonable services finding, the record must show that the child welfare agency " 'identified the problems leading to the loss of custody,

17

offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426, (italics omitted).) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) In reviewing a reasonable services finding, we must determine whether there is substantial evidence from which the juvenile court could have made the finding by clear and convincing evidence. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674 (*Serena M.*).)

" 'Visitation is a critical component, probably the most critical component, of a reunification plan.' [Citation.] 'Without visitation of some sort, it is virtually impossible for a parent to achieve reunification.' [Citation.] 'The absence of visitation will not only prejudice a parent's interests at a section 366.26 hearing but may "virtually assure[] the erosion (and termination) of any meaningful relationship" between [parent] and child.' [Citation.] [¶] To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child. [Citation.] Visitation requirements exist '[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent.' " (*Serena M.*, *supra*, 52 Cal.App.5th at p. 673.) However, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) Furthermore, "if visitation is not consistent with the well-being of the child, the juvenile court has the discretion to deny such contact. As courts have explained, 'well-

18

being' includes the minor's emotional and physical health." (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.)

"[T]he power to regulate visitation between minors determined to be dependent children [citation] and their parents rests in the judiciary." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756 (*Jennifer G.*).) Thus, "the juvenile court cannot delegate the decision whether visitation will occur to any third party, including the child, the social services agency, or the guardian." (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516.) " 'A visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner,' " but " ' "ultimate supervision and control . . . must remain with the court." ' " (*Id.* at p. 517; see *In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1135–1136 (*Kyle E.*) [improper delegation where visitation order stated nothing more than " 'father shall have supervised visitation with [the minor] as frequent as is consistent with the well-being of [the minor]]' "; *In re S.H.* (2003) 111 Cal.App.4th 310, 317–318 (*S.H.*) [improper delegation of visitation power to children]; *Julie M., supra*, 69 Cal.App.4th at p. 46 [same]; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1475 [improper delegation to children's therapist]; *Jennifer G., supra*, 221 Cal.App.3d at pp. 757–758 [improper delegation to child welfare agency].)

Here, the crux of Mother's challenge to the juvenile court's reasonable services finding is her contention that the court and the Agency improperly delegated the determination of whether visitation would occur to Minor. In response, the Agency maintains that the juvenile court "never vested absolute discretion over visitation" in Minor, and that reasonable efforts were made to facilitate visitation, but Minor simply could not be persuaded. On this record, we agree with Mother that too much discretion was given to Minor in this case.

19

To begin with, there is some ambiguity in the record as to whether the juvenile court delegated its visitation power to the Agency. At the six-month review and disposition hearings, the court ordered that Mother was "to receive visitation . . . [a]s previously ordered." While the phrase "to receive visitation" suggests an affirmative grant of Mother's right to visitation, the subsequent phase "[a]s previously ordered" appears to refer back to the court's initial visitation ruling at the detention hearing. But the interlineations in that minute order, combined with the absence of any grant of visitation, suggest the court gave the Agency complete discretion to determine whether visitation would occur. (See *ante*, fn. 2.) Thus, the "[a]s previously ordered" phrase could be viewed as carrying forward the court's initial delegation of visitation power to the Agency throughout the proceedings and up to the 12-month review period.[4]

The Agency acknowledges that at the time of detention, the juvenile court "gave discretion to the Agency to begin visitation," but the Agency maintains this was "per the San Francisco Superior Court's Local Rules because the court also issued a restraining order protecting [Minor] from mother, at minor's counsel's request." However, the Agency fails to cite any specific local rule or explain why the restraining order justified delegating the

---

[4]    To be clear, Mother has not challenged the juvenile court's visitation rulings at the detention or disposition hearings, or its reasonable services finding at the six-month review hearing. She has therefore waived any challenges to those orders. (See *In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.) Nevertheless, the juvenile court remained obligated to assess the reasonableness of services at the 12-month review stage (§ 366.21, subd. (e)(8)), and this necessarily included assessing whether the Agency took reasonable steps to facilitate and implement the court's visitation order in the time between the six- and 12-month review hearings.

20

decision whether visitation would occur at all (as opposed to the time, place, and manner of visitation) to the Agency.

Another issue with the juvenile court's visitation order as carried forward throughout this case is that the court did not specify the frequency and duration for visits, an omission that some courts have criticized. (See *Kyle E.*, *supra*, 185 Cal.App.4th at pp. 1134–1135 [order was "problematic" because it provided for "supervised visitation and nothing more"]; *S.H.*, *supra*, 111 Cal.App.4th at p. 319 [failure to mandate minimum number of visits rendered parent's right to visitation "illusory"]; *Jennifer G.*, *supra*, 221 Cal.App.3d at p. 757 [courts "should determine whether there should be any right to visitation and, if so, the frequency and length of visitation"].) Although the courts are split as to whether such details must be specified in every case (see *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1371–1372, 1373–1375 (*Moriah T.*) [disagreeing with *Jennifer G.*]), a visitation order should, at a minimum, indicate in some fashion that a parent has the right to visit a child " 'regularly,' " with "broad 'guidelines as to the prerequisites of visitation or any limitations or required circumstances.' " (*Moriah T.*, at p. 1377.) Here, the court's visitation order fell short of this more flexible standard, thereby implying that the decision whether visitation would occur at all was left entirely to the Agency.

Despite the immense importance of visitation to the reunification plan (*Serena M.*, *supra*, 52 Cal.App.5th at p. 674) and the statutory mandate that visitation occur "as frequent as possible" (§ 362.1, subd. (a)(1)(A)), it does not appear that the Agency took any formal steps to implement visitation as a mandate of the dependency court, such as creating a tentative visitation schedule or identifying suitable referrals for therapeutic visitation. Nor did the Agency seek clarification from the juvenile court on the frequency and

21

length of visits or any other general "limitations or required circumstances" for visitation. (*Moriah T.*, *supra*, 23 Cal.App.4th at p. 1377.) Indeed, the record contains no indication that the Agency took any affirmative steps to arrange any kind of contact between Mother and Minor, whether in-person, video, or even telephonic, during the entire dependency proceedings.

Even if we were to construe the language that Mother was "to receive visitation" as an affirmative grant of her right to visitation, and that the "[a]s previously ordered" language merely conferred discretion to the Agency over the details of visits, we would nonetheless conclude the Agency's efforts to implement the visitation order fell short in other respects. Though the Agency maintains it did everything it could to facilitate visitation—i.e., by encouraging Minor to contact Mother, providing him with Mother's letters and monthly updates of her progress in services, and arranging for Minor to receive individual therapy—these actions seemed to reflect and reinforce the misguided view that the ultimate decision as to whether visitation would go forward was up to Minor. As such, the right to visitation may have been granted "in theory" but "none was permitted in reality" because Minor was "given virtually complete discretion to veto visitation." (*In re Hunter* (2006) 142 Cal.App.4th 1497, 1505.)

*S.H.*, *supra*, 111 Cal.App.4th 310, is instructive. There, the court held that "by failing to mandate any minimum number of monitored visits per month or even to order that *some* visitation *must* occur each month, the [juvenile] court's abstract recognition of Marie R.'s right to visitation is illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all." (*S.H.*, at p. 319.) In so holding, *S.H.* did "not suggest[] either that the juvenile court must always specify the frequency or length of visits [citations] or that the court may not direct that

22

the child's wishes with respect to the timing, length or location of visits be considered." (*Ibid.*) However, *S.H.* emphasized that "while the juvenile court may allow the child to refuse to attend a particular visit, to prevent the child from exercising a de facto veto power, there must be some assurance that, should that occur, another visit will be scheduled and actually take place. The simplest—but, by no means, the only—way to accomplish this would be for the juvenile court to order a minimum number of visits per month and to impose any essential conditions . . . , while allowing the [child welfare agency] to organize other details of the visitation. In no event, however, may the child's wishes be the *sole* factor in determining whether any visitation takes place, either as a formal matter or, as occurred in the case now before us, by effectively giving the children the power to veto all visits." (*S.H.*, at pp. 319–320.)

Here, too, it appears the juvenile court's visitation order was rendered illusory by Minor's ability to veto any suggestions put forth by the Agency. The record does not disclose efforts by the Agency to reinforce the court-ordered nature of visitation or take measures that provided "some assurance" visitation "would actually take place." (*S.H.*, *supra*, 111 Cal.App.4th at pp. 319–320.) Instead, it appears the Agency acquiesced in Minor's ability to effectively shut down the topic of visitation each time it was raised.

This is not to suggest that Minor—who is now 16 years old—could be forced to attend visits against his will. (Accord, Cal. Code Regs., tit. 22, §§ 80072, subd. (a)(3) [foster youth have right to be free from coercion], subd. (a)(7) [foster youth cannot be locked in any room, building, or premises], subd. (a)(8) [foster youth cannot be placed in restraining device], 89475.2, subd. (a) [foster caregivers shall not restrain child].) Moreover, services need only be reasonable under the circumstances (*Misako R.*, *supra*,

23

2 Cal.App.4th at p. 547), and here there were circumstances justifying the Agency's decision to forestall or otherwise limit visitation out of concern for Minor's emotional well-being.  (See *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 [" 'child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation' "]; *Julie M.*, *supra*, 69 Cal.App.4th at pp. 50–51 [child's aversion to visiting abusive parent may be " 'dominant' " factor in administering visitation, but not sole factor].)  For instance, early in the dependency, the Agency reported that Minor had severe anxiety and suicidal ideations regarding his relationship to Mother.  Under these circumstances, when the trauma of abuse was still fresh, the Agency could reasonably forestall visitation for the sake of Minor's emotional well-being.

But we also observe that as the reunification phase progressed, Mother successfully completed numerous items of her case plan and services (including therapy, anger management, and parenting courses regarding teenagers), and the Agency began reporting that Minor's aversion to visitation was rooted more in his doubt that Mother would ever truly change, as well as his feelings of betrayal from their prior family therapy experience at Huckleberry House.  Even accepting that these feelings were justified, we are not aware of any authority supporting the conclusion that a minor's doubt in a parent's rehabilitative progress is a valid (much less controlling) factor to be considered in refusing to implement court-ordered visitation.  If anything, it seems that some form of meaningful contact would be pivotal in rebuilding a minor's trust and helping to combat doubts that an abusive parent can genuinely change through therapy and social services.  A complete lack of visitation, on the other hand, would "virtually assure[] the erosion (and

24

termination) of any meaningful relationship" between them. (*Serena M.*, *supra*, 52 Cal.App.5th at pp. 673–674.)[5]

The Agency relies on *In re Sofia M.* (2018) 24 Cal.App.5th 1038 (*Sofia M.*) for the proposition that a juvenile court has no duty to ensure that the child welfare agency's efforts are ultimately effective in overcoming a minor's opposition to visitation. (*Sofia M.*, at p. 1047.) Although *Sofia M.*, like the instant matter, involved a teenage dependent's refusal to visit her mother, it is otherwise distinguishable in key respects. The visitation order in *Sofia M.* expressly provided for visitation twice a week, four hours at a time, and the mother, after attending an initial monitored visit, failed to regularly meet with the daughter, leading to the daughter's eventual opposition to further visits. (*Sofia M.*, at pp. 1041–1042, 1046.) In other words, the order contained explicit acknowledgment of the mother's right to regular visitation, and the mother was given ample opportunities to avail herself of this service but failed to do. That is a far cry from what occurred here.

In sum, we cannot conclude substantial evidence supports a finding by clear and convincing evidence that Mother received reasonable reunification services, as it appears from the record that the juvenile court and the Agency acquiesced in Minor's ability to effectively veto any and all visitation in this case.

Nor can we conclude the error was harmless. (See *In re Celine R.* (2003) 31 Cal.4th 45, 59–60.) Granted, it is possible that nothing the juvenile court or the Agency said or did would have persuaded Minor to make contact with Mother. Ultimately however, we think the manner in which court-

---

[5] This is not to suggest that Minor's trauma can no longer be a relevant or even dominant factor in deciding how to implement the visitation order going forward.

ordered visitation is discussed, planned, and negotiated with a minor may have an appreciable effect in how the youth responds to it. Had the Agency scheduled regular visits and emphasized their court-ordered nature, we think it is reasonably probable Minor would have eventually come around. Minor notably expressed a desire to have a better relationship with Mother from early in the proceedings. He was also initially distrustful of individual therapy but eventually made progress on that front. Although Minor terminated his therapy after two months,[6] the Agency resubmitted its referral in the hopes of finding a better-fitting therapist for Minor. It stands to reason that effective individual therapy will provide Minor an opportunity to process and gain insight into his feelings of anger and distrust—the same emotions fueling his aversion to visitation—while also allowing for cooperation between the Agency and therapist to steer Minor towards possible reunification.

And though the record suggests that Mother continued to struggle with her tendency to blame Minor and others for the consequences of her actions, we cannot say that Mother's mixed success on this score, by itself, supported termination of reunification services at the 12-month review stage. (See *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1327–1328 [dependency laws do not demand perfection from parents].) Indeed, had reasonable efforts been made to implement the visitation order, the resulting visits may very well have assisted Mother in overcoming the hurdles that were proving more difficult. We leave it to the juvenile court on remand to

---

[6] Here, too, it appears the Agency may have ceded too much discretion to Minor. While the Agency could not force Minor to engage in therapy for which he was not prepared (see, e.g., *In re F.P.* (2021) 61 Cal.App.5th 966, 975), the only reasons given for Minor's discontinuation of individual therapy were that he felt he did not need it, and that it took away time from sports.

reassess the full impact of the text message and Mother's overall efforts to resolve the problems that led to the dependency once the Agency has made reasonable efforts to implement the visitation order for another six-month period.

## DISPOSITION

The petition is granted.  Let an extraordinary writ issue directing the juvenile court to vacate its May 6, 2024, order terminating reunification services and setting a section 366.26 hearing.  The court shall enter a new and different finding that reasonable services were not offered or provided to Mother and shall order reunification services consistent with this opinion.  The court shall also set an 18-month review hearing at the earliest convenient time.  This opinion is final in this court on filing.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P.J.

_____
Rodríguez, J.

*V.K. v. Superior Court City & County of San Francisco* (A170399)

27